# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MICHAEL LAWRENCE LEE | * | |
| | * | |
| v. | * | Case No. RDB-09-2203 |
| | * | |
| GREGORY HERSHBERGER, WARDEN | * | |
| et al. | * | |

\*\*\*\*\*\*

## MEMORANDUM

Michael Lawrence Lee ("Petitioner" or "Lee") filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on August 21, 2009, challenging his convictions in the Circuit Court of Howard County, Maryland. (ECF No.1). On January 31, 2003, after a three day trial, a jury convicted Lee of armed carjacking, carjacking, armed robbery, robbery, unlawfully taking a motor vehicle, unauthorized use of a motor vehicle, theft of property valued at more than $500, use of a handgun in the commission of a crime of violence, and transporting a handgun. Lee was sentenced to a total of thirty years in prison.

In his § 2254 petition, Lee challenges his convictions on four separate grounds: (1) that he received ineffective assistance of counsel; (2) that the trial court improperly restricted his cross-examination of a witness; (3) that the trial court provided an erroneous supplemental instruction to the jury; and (4) the trial court erroneously denied his motion for mistrial.

The State filed an answer to Lee's habeas corpus petition (ECF No. 9), and Lee filed a reply (ECF No. 11). The issues pertaining to this motion have been fully briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons set forth below, the Petition for Writ of Habeas Corpus will be denied.

# BACKGROUND

Lee was charged in the Circuit Court for Howard County with offenses relating to a July 25, 2002 carjacking.[1] The facts developed at trial, as summarized by the Court of Special Appeals of Maryland, were as follows:

> This case involves an armed carjacking that occurred during the early morning hours of July 25, 2002, in the parking lot of an apartment complex in Columbia, Maryland, Testifying for the State, among others, were Donnell Ledbetter, Jose Medina, and Dr. Patson Nhamburo, the victim. Appellant and his mother testified for the defense. Viewing it in the light most favorable to the State as the prevailing party, the evidence elicited at trial established the following.
>
> In the summer of 2002, Ledbetter, who was from New York, stayed with a friend in Woodlawn, Maryland for a few weeks. During his stay he was joined by Medina, a friend from New York. At that time, appellant and his son, Michael Lee Jr. ('Mike'), lived in an apartment in Columbia, Maryland.[2]
>
> Ledbetter's and Medina's testimonies, both testifying pursuant to a plea agreement, were substantially similar.[3] On the evening of July 25, 2002, Ledbetter and Medina took public transportation to Mike's apartment. Ledbetter knew Mike through Mike's younger brother. Appellant, along with others, was present at the apartment, Mike, appellant, Ledbetter, and Medina "hung out" at the apartment for several hours. Around 2:00 a.m., Ledbetter asked Mike for a ride to Woodlawn. Mike told him that he would try to borrow a car from a friend.
>
> Mike, appellant, Ledbetter, and Medina left the apartment and walked toward a nearby apartment complex. Mike told Ledbetter and Medina they were walking to his friend's house. Mike and appellant were wearing black sweatshirts with hoods. After about five minutes, the four came to a driveway into an apartment complex. Ledbetter told Mike and appellant that he and Medina would wait on the sidewalk in front of the complex while they got the car.

---

[1] References herein to "Exhibits" or "Exh." refer to the exhibits attached to the State's Answer to Petition for Writ of Habeas Corpus.

[2] Because both appellant and his son have the same first and last name, we shall refer to the son as "Mike."

[3] Each man was charged with the unlawful taking of a motor vehicle, felony theft, and unauthorized use of a motor vehicle, Bases on their plea agreements, they would receive a stet on the charges against them if they testified truthfully at appellant's trial.

Standing on the sidewalk, both Ledbetter and Medina saw a car drive past them into the apartment complex and park. A man exited the car and walked toward the complex. Mike, who had pulled a "do-rag" down to partially cover his face, approached the man and stuck a gun in his face.[4] Appellant stood in the shadows acting as a lookout. The victim handed Mike what looked like keys. Mike and appellant then got into the car. Mike drove and appellant sat in the front passenger seat.

Mike drove toward Ledbetter and Medina, and in a "rough" tone told them to get in the car. Shocked, Ledbetter and Medina looked at each other for a couple of seconds. Mike repeated the demand and Ledbetter and Medina again looked at each other. When Mike again told them, "Get . . . in the car," they did. Ledbetter sat behind Mike; Medina sat behind appellant. Mike passed a gun to appellant who tucked it under his seat.

Mike drove to the house where Ledbetter and Medina were staying in Woodlawn. When they arrived, all four got out of the car. Mike and appellant started wiping down the car for prints and Ledbetter and Medina did the same. The group then went to a store to get something to eat. En route to the store, a police officer in a marked police car pulled up behind them.[5] Mike stopped the car and all four jumped out and fled.

Ledbetter was arrested less than sixty feet from the car where he was found hiding in some bushes. The police also arrested Medina a short distance from the car. The police did not apprehend appellant or Mike at that time. During a search of the vehicle, the police recovered a black sweatshirt wrapped around a loaded handgun under the passenger seat. Three hand prints recovered on the passenger side of the car were appellant's.

Ledbetter and Medina were taken to a police station for questioning. Both waived their *Miranda* rights.[6] Detective Leeza Grimm, the lead investigating officer, testified that she first spoke to Medina, who said that appellant and his son had pulled up in a car and asked them to go for a ride. She then spoke to Ledbetter, who gave a statement similar to his trial testimony. Confronted with Ledbetter's statement, Medina changed his statement and gave one similar to Ledbetter's.

Both Ledbetter and Medina testified that they did not know the carjacking was going to happen and that they did nothing to plan it. Medina testified that, while in jail on the charges that were initially brought against him, he was housed in the same facility as appellant. Appellant told him not to testify against him.

---

[4] Ledbetter explained that a "do-rag" was "something that people wear like, you know, like you tie it on your head like for waves. Or like if you got braids, as myself, you tie it on so it could hold your hair down."

[5] Apparently, the police received an anonymous tip around 3:00 a.m. that four men were wiping off a car. The tag numbers and description given matched the car the four were in.

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

>	Mike and appellant were subsequently arrested. Detective Grim testified that when she advised appellant of the charges against him and that his fingerprints were found on the car, appellant said "he had no idea what I was talking about."

>	Dr. Patson Nhamburo, the victim, testified that as he was driving to the parking lot of his apartment complex, he saw two men running across the road. He thought little of it, continued driving, and parked his car. He got out of the car, locked it, and started walking toward his building. A man wearing a mask appeared "from nowhere" and pointed a gun at his face. The armed man demanded his car keys, which he gave to him. The armed man and another man then got into his car and drove off. Dr. Nhamburo went to a neighbor's apartment and called 911. Dr. Nhamburo testified that when the carjacking occurred he was standing in the parking lot a few feet away from the apartment complex main door and that he could see his car.

>	Several days after the carjacking, Dr. Nhamburo was shown a police photographic array. He identified a picture of Mike as the man with the gun, but he was unable to identify the other man involved.

>	Appellant and his mother testified for the defense. Appellant's mother testified that around 2:30 a.m. on July 26, 2002, two young black males came to her home where she lived with appellant and Mike. Mike went outside for a few minutes with the men. At some point, she asked appellant to go outside to check on him. When Mike and appellant came back into the house, they discussed buying a car. She told her grandson that she would not allow him to buy a car in the early morning hours.

>	Appellant testified that early one morning two men tried to sell a car to his son. Believing that the car was stolen, appellant told him not to buy the car. Appellant denied being involved in the incident.

Exh. 9 at 2-6.

On January 31, 2003, the jury announced that it had reached a verdict of guilty on all counts. Exh. 5 at 18-19. During polling, however, juror eight did not accept the verdict. Exh. 5 at 20. The trial judge instructed the jury to continue deliberating to reach a unanimous verdict, or to report an eleven-to-one deadlock. Exh. 5 at 21-26. After further deliberations, the jury unanimously convicted Lee of all counts charged. Exh. 5 at 38-41. On May 15, 2003, the Court denied Lee's motion for new trial and sentenced him to thirty years in prison. Exh. 6.

Lee filed a direct appeal of his convictions, and the judgments were affirmed by the Maryland Court of Special Appeals by an opinion issued on March 15, 2005. Exh. 9. Lee filed a

petition for writ of certiorari to the Court of Appeals of Maryland, which was denied on June 17, 2005. Exh. 10, 11.

On March 16, 2006, Lee filed a petition for post-conviction relief in the Circuit Court for Howard County. Exh. 12. A hearing was held on November 1, 2007, and the petition was denied via written opinion dated April 29, 2008. Exh. 14, 16. The application for leave to appeal to the Court of Special Appeals was denied on June 29, 2009, with a mandate issued July 29, 2009. The instant petition was timely filed on August 21, 2009.

**ANALYSIS**

The amendments to 28 U.S.C. § 2254, enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), require this Court to limit its analysis to the law as it was "clearly established" by precedent at the time of the state court's decision. Section 2254 provides:

> "(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

The "unreasonable application" prong of § 2254(d)(1) permits a federal habeas court to "grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts" of petitioner's case. *Williams v. Taylor,* 529 U.S. 362, 413 (2000); *see also Bell v. Cone,* 535 U.S. 685, 694 (2002). In other words, a federal court may grant relief when a state court has misapplied a "governing legal

principle" to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade,* 538 U.S. 63, 76 (2003) (*citing Williams,* 529 U.S. at 407). To be "unreasonable," the state court's application of Supreme Court precedent must have been more than incorrect or erroneous. *See Lockyer,* 538 U.S. at 75. The state court's application must have been "objectively unreasonable." *See Williams v. Taylor,* 529 U.S. at 409*, see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). That high standard has not been met in Lee's case. Each issue he raises is addressed sequentially below.

**I.     Ineffective Assistance of Counsel**

Lee asserts that he received ineffective assistance of counsel. Although his petition does not specify the factual basis for that assertion, Lee states that "counsel admitted to giving Petitioner ineffective assistance to the trial court, documented it on record, and admitted to it on the stand at post-conviction." ECF No. 1 at 6. Lee's reply memorandum focuses on counsel's failure to call Officer Helphenstine as a witness. ECF. No. 11 at 4. Defense counsel did testify at the post-conviction hearing that it was error not to call the officer, and that she believes the officer's testimony would have made a difference at trial. Exh. 14 at 9-16.

The two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs the standard for examining ineffective assistance claims. First, a petitioner must demonstrate that the performance of his counsel was deficient by falling below an objective standard of reasonableness. *Id.* Second, a petitioner must demonstrate that he suffered prejudice as a result of the defective performance. *Id.* The Supreme Court has made it clear that courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that,

under the circumstances, the challenged action might be considered a sound trial strategy." *Id.* at 689.

In the context of a § 2254 proceeding, it is not sufficient to convince the federal habeas court that the state court merely applied *Strickland* incorrectly. Rather, a petitioner must show that the state court applied *Strickland* to the facts in an objectively unreasonable manner. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002).

Lee has not met the burden, required by *Strickland*, to prove that counsel's decision was unreasonable professional assistance or something other than sound trial strategy, and therefore has not established that the state court applied *Strickland* in an objectively unreasonable manner. Officer Helphenstine was unavailable at trial because of a medical emergency. Exh. 14 at 10, 30. As a result, the state and defense counsel stipulated to Officer Helphenstine's testimony, and at the time of trial, defense counsel believed that the stipulation was a sufficient method of "getting the evidence in that I wanted in." Exh. 14 at 10; *see also* Exh. 14 at 11-12, 30. In alleging that counsel's performance was deficient, Petitioner repeatedly cites the fact that the description of the suspect in Officer Helphenstine's report varies from his own physical description. However, the post-conviction court "had the opportunity to observe the Petitioner at the hearing on this Motion, and to review photographs of the Petitioner taken at the time of the offense. Officer Helphenstine's description of the front seat passenger is consistent with the appearance of Petitioner." Exh. 16 at 5. The post-conviction court further noted:

> The only area where Officer Helphenstine's report differed greatly was in respect to Petitioner's age and the report of the suspect's age. Petitioner was forty-four years of age at the time of trial, but even at the time of the hearing on this motion he maintains a youthful appearance. When considering the circumstances existing at the time of Officer Helphenstine's observations, the description noted by Office [sic] Helphenstine in his report, and Petitioner's actual appearance, the Court finds that any benefit Defendant would have received from the Officer's testimony, if any, would have been minimal.

Exh. 16 at 5. The post-conviction court further observed that other witnesses, specifically Jose Medina and Donnell Ledbetter, also identified Petitioner as an occupant of the vehicle. *Id.*

For all of those reasons, the post-conviction court determined that defense counsel's decision not to call Officer Helphenstine as a witness did not constitute deficient performance under the first prong of *Strickland*. This Court agrees. Despite defense counsel's post-trial change of heart about her strategy, it was a reasonable professional decision to decide not to seek a continuance to procure Officer Helphenstine's live testimony and instead to obtain the needed testimony via stipulation. In addition, the post-conviction court further determined that Petitioner has not established that the failure to call Officer Helphenstine prejudiced the defense. The post-conviction court, having seen Petitioner in person, had a far better vantage point to assess the potential value of the description testimony, and it applied the appropriate legal standards in *Strickland* to its analysis. This Court cannot opine that the post-conviction court's analysis was "objectively unreasonable," and federal habeas relief must be denied.

## II. Opportunity for Cross-Examination

Lee's second contention is that the trial court erred when it restricted the cross-examination of a witness, Jose Medina. ECF No. 1 at 6; ECF No. 11 at 2. Medina had given an initial statement to police upon his arrest, which was memorialized in a report. Medina subsequently changed his story when confronted with another witness's version of events. Medina's trial testimony was consistent with his second statement. The trial court refused to permit defense counsel to use the police report to refresh Medina's recollection as to the details of his initial statement. No federal habeas relief is warranted on this issue.

The Court of Special Appeals determined that the trial court had erred, and concluded that "it was an abuse of discretion to deny appellant the opportunity to confront Medina with the

police report that reflected his contradictory statements." Exh. 9 at 12. However, the Court of Special Appeals addressed harmless error as follows:

> In *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), the Supreme Court set forth five factors that an appellate court should use to decide the extent to which an error contributed to the verdict: 1) the importance of the tainted evidence; 2) whether the evidence was cumulative or unique; 3) the presence or absence of corroborating evidence; 4) the extent of the error; and 5) the overall strength of the State's case. We are mindful that the defendant is not required to prove that the error contributed to the verdict. Instead, the test is whether the State had proven beyond a reasonable doubt that the error did not contribute to the verdict. *Id.*
>
> We are persuaded that not permitting Medina's memory to be refreshed by the police report did not impact the jury's verdict and therefore was harmless beyond a reasonable doubt. First, Detective Grim, who was subject to cross-examination, had already testified that Medina had given an earlier statement, but immediately retracted it when presented with Ledbetter's statement. Medina's testimony at trial, which was consistent with his second statement, was cumulative to Ledbetter's testimony. His first statement did not exculpate appellant and, in fact, placed him in the stolen automobile. Moreover, even though Dr. Nhamburo could not identify appellant, his testimony as to what happened was consistent with the testimony of both Ledbetter and Medina. In addition, Ledbetter testified that appellant was wearing a black sweatshirt that night and that he sat in the passenger seat. The jury was presented with evidence showing that three of appellant's hand prints were found on the passenger side of the car and a handgun wrapped in a black sweatshirt was recovered under the passenger seat.

Exh. 9 at 13-14. The state court's analysis was squarely on point and cannot be described as an objectively unreasonable application of *Van Ardsall*. While the state court did not sequentially address the *Van Ardsall* factors, its analysis considered the importance of the evidence (by pointing out that the first statement did not exculpate Petitioner), the uniqueness of the evidence (by noting that Detective Grim testified about Medina's earlier inconsistent statement), the presence or absence of corroborating evidence (by indicating that Medina's trial testimony was corroborated by two other witnesses), the extent of the error (by reviewing all of the other evidence detracting from the importance of the attempt to refresh Medina's recollection), and the strength of the State's case (by discussing the evidence of Petitioner's hand prints and sweatshirt in the car). The state court's analysis was reasonable and will not be disturbed.

### III. Erroneous Jury Instructions

Next, Lee contends that the trial judge gave an erroneous supplemental jury instruction in response to the jury's inquiry, "Does Dr. Nhamburo's having his car keys in his possession and the fact that he was walking a few feet from his car constitute possession of a motor vehicle?" Exh. 5 at 6. The trial judge gave the following response to the jury:

> Now yesterday, in anticipation of that question, we provided you with the answer. The answer is in the bottom of the car-jacking instruction . . . That the defendant used force or violence against a person or put the person in fear through intimidation or threat of force or violence in order to obtain the motor vehicle. That the motor vehicle was in the actual possession of another person at that time. Actual possession requires that the vehicle be in the individual's care, . . . custody, . . . control, . . . management or possession. Those are the words. We can't define those words. Those are common, ordinary, unambiguous words of the English language and each of you has to interpret and apply these words to this factual situation. Did Mr. Nhamburo, who had the only keys to the car, who is walking away from his car, was a matter of feet – the distance may be debatable – did he have care of the car, did he have custody of the car, did he have control of the car, did he have management of the car or did he have possession of the car? And in resolving that issue, you may consider if he didn't, who did?
>
> [DEFENSE COUNSEL]    Your Honor –
>
> THE COURT: There has to be somebody in the universe who had care, custody, control, management or possession. Care, custody, control, management or possession. Now, having left the immediate proximity of his car, on his way in, you may find that he did not have care, custody, control, management or possession. Because he was leaving it. And the State made an argument to you that he had custody, control, management or possession because nobody else did. And the defense made arguments to you that his leaving the vicinity of his car negated this. And either side may be correct. It is up to you to determine what those words mean and apply it to the testimony and evidence that you heard in the case. Now we can't provide any definitions. Those are the words and they're not ambiguous.

Exh. 5 at 7-8. After some further discussion, the Court asked the parties to approach the bench. Petitioner moved for a mistrial, and stated:

> As an alternative, I would ask you to explain that there's a difference between ownership of the vehicle and possession of the vehicle. And there is a difference. And I think, I think the answer to your question is, if it's not him, who is – there's no question he's the owner of the car and the one with the superior right to it. That doesn't make this a carjacking if they believe he had, uh, was not in any, in actual possession of it at the time.

Exh. 5 at 10-11. The trial court agreed to give that supplemental instruction, and instructed the jury as follows:

> All right, I don't want any comments that I made with respect to the carjacking to be misunderstood. As you read this instruction – I think each of you was given a copy of this instruction – you'll notice that ownership has nothing to do with it. You can give your child, your uncle, your mother or somebody use of your car and that person can be the – having the car – can be the subject of a carjacking. So carjacking just doesn't apply to the owners of cars. It applies to anybody who is in actual possession of a vehicle. And what does actual possession mean? Well, down here at the bottom it tells you what actual possession – what it means. So. You'll have to answer that question for yourself.

Exh. 5 at 12-13.

The Court of Special Appeals determined that the issue had not been preserved for appellate review, because defense counsel had acquiesced in the court's supplemental instruction. Exh. 9 at 23-26. Defense counsel had requested the supplemental instruction as an alternative remedy, and did not lodge any objections to it. *Id.* That ruling appears to have been entirely correct, and does not present any constitutional issues appropriate for federal habeas relief.

Petitioner also suggests that defense counsel's failure to object to the supplemental instruction constituted ineffective assistance. ECF No. 11 at 8. He acknowledges that the issue was not raised on post-conviction, and faults his "post-conviction counsel" to try to show "cause" to excuse the failure to follow the state's procedural rules. *Id; see also Wainright v. Sykes*, 433 U.S. 72 (1977). However, Petitioner filed his post-conviction motion *pro se*, and included nine other "errors" allegedly made by his trial counsel. Exh. 12. He did not include this issue. He subsequently obtained the services of a public defender, who filed a supplement to

11

his post-conviction motion, but did not supplant his original motion. Exh. 13. Again, the supplemental motion did not raise this issue. Under these circumstances, Petitioner has not demonstrated cause for failure to raise this issue in post-conviction, and this court is precluded from considering his federal constitutional claim.

IV. **Denying Mistrial After Polling Jury on Initial Verdict**

Finally, Lee asserts that the trial court erred in denying a motion for mistrial after one juror disavowed the original verdict during polling of the jury. Specifically, after an original guilty verdict was returned, when the jury was polled, juror number eight indicated disagreement with the verdicts. Exh. 5 at 20. The trial court originally advised the jury, "All right, juror number eight says that those are not her verdicts, so you'll have to return to the deliberation room until you have unanimous verdicts." Exh. 5 at 21. At a bench conference, Petitioner moved for a mistrial, arguing that the Court's instruction was "unduly coercive." *Id.* The trial court denied the motion for mistrial, but further instructed the jury as follows:

> The verdict sheet reflects a verdict of guilty as to each of the nine counts. And it's signed by the foreperson. However, in polling each of the jurors, juror number eight said that those are not her verdicts. Now I don't know if she disagrees with one of the verdicts, or two of the verdicts, or all nine. But the definition of a verdict is unanimous. Has to be twelve to nothing. So that everybody said these are my verdicts. If they're not my verdicts, then there's not a verdict. So it has to be all twelve. Now, if it's a hopeless eleven to one, then you can come back and say so . . . So you have to take a vote on each count and there might be some progress on one count or two counts or none. That's fine. But we have to know that a verdict is unanimous and anything less than unanimous is not a verdict. And if it's hopeless, eleven to one, on one or each or all the counts, then we have to know that.

Exh. 5 at 25-26.

In analyzing the propriety of the trial court's actions, the Court of Special Appeals relied on *Heinze v. State*, 184 Md. 613, 617, 42 A.2d 128 (1945). "Where a verdict is ambiguous, inconsistent, unresponsive, or otherwise defective, it is the duty of the trial judge to call the

jury's attention to the defect and to direct them to put the verdict in proper form either in the presence of the court or by returning to their consultation room for the purpose of further deliberation." *Id.* at 618-19. It appears that the Court of Special Appeals accurately decided that the trial court properly followed the dictates of *Heinze*. The trial court's final instruction, which told the jury to either reach a unanimous verdict on each count or inform the court of an eleven-to-one deadlock, did not improperly influence the deliberations because it allowed for either outcome. There was therefore no error committed by the trial court, and certainly no constitutional error of the sort that would warrant federal habeas relief.

**Conclusion**

For the reasons stated herein, Lee's Petition for Writ of Habeas Corpus is DENIED. A separate Order follows.

A certificate of appealability shall not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2000). A petitioner satisfies this standard by demonstrating that reasonable jurists would find that an assessment of the constitutional claims is debatable and that any dispositive procedural ruling dismissing such claims is likewise debatable. *Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003); *Rose v. Lee*, 252 F.3d 676, 683-84 (4th Cir. 2001). Because reasonable jurists would not find Petitioner's claims debatable, a certificate of appealability is DENIED.

Dated: December 13, 2011 _____/s/_____
Richard D. Bennett
United States District Judge